LAW OFFICES OF
# GREENAN, PEFFER,
## SALLANDER & LALLY LLP

6111 BOLLINGER CANYON ROAD, SUITE 500
POST OFFICE BOX 10
SAN RAMON, CALIFORNIA 94583-0010

TELEPHONE
(925) 866-1000

FACSIMILE
(925) 830-8787

WRITER'S E-MAIL ADDRESS:
dburnick@gpsllp.com

November 3, 2006

**BY FACSIMILE & MAIL**
The Hon. Lawrence K. Karlton
District Court Judge
United States District Court
Courtroom 4, 15th Floor
501 "I" Street
Sacramento, CA 95814

Re: *Marcia Starr-Gordon v. Massachusetts Mutual Life Insurance Co., et al.*
United States District Court for the Eastern District of California
Case No.: 03-CV-68 LKK (GGH)

Dear Judge Karlton:

This office represents Plaintiff Marcia Starr-Gordon.

At the October 23rd Hearing on MassMutual's Motion for Partial Summary Judgment, you questioned counsel for the parties on several issues raised in the papers. One such issue was MassMutual's reliance on surveillance footage to terminate Plaintiff's policy benefits.

In an effort to further assist the Court while it considers this matter, we would like to call attention to *Glockson v. First Unum Life Insurance Co.*, 7:04-CV-838, 2006 U.S. Dist. LEXIS 47613, 2006 WL 1877140 (N.D.N.Y., July 6, 2006). Under ERISA, the *Glockson* opinion discusses the appropriate role surveillance footage and other medical evidence should play in evaluating a total disability claim, finds "snapshot evaluations, like surveillance, ...logically suspect", and holds that the insurer's termination of plaintiff's benefits based primarily on surveillance footage "arbitrary and capricious." A courtesy copy of the opinion is enclosed.

Thank you for your consideration.

Very truly yours,

GREENAN, PEFFER, SALLANDER
& LALLY LLP

Dean C. Burnick
Dean C. Burnick

Enclosure
cc: Robert L. Sallander
Steve Prignano (by facsimile with enclosure)
Robert R. Pohls (by facsimile with enclosure)

Briefs and Other Related Documents
**Glockson v. First Unum Life Ins. Co.**N.D.N.Y.,2006.Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Carolyn J. GLOCKSON, Plaintiff;
v.
FIRST UNUM LIFE INSURANCE COMPANY, Defendant.
No. 7:04-CV-838.

July 6, 2006.

Lionel Hector, Esq., of counsel, Carthage, NY, for Plaintiff.
Bond, Schoeneck & King, PLLC, Lillian A. Abbott-PFOHL, Esq., of counsel, Syracuse, NY, for Defendant.

*MEMORANDUM-DECISION and ORDER*
DAVID N. HURD, District Judge.

### I. *INTRODUCTION*

*1 Carolyn **Glockson** ("plaintiff" or "**Glockson**") brings this action against First Unum Life Insurance Company ("defendant" or "First Unum") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, challenging First Unum's denial of long-term disability benefits. Plaintiff moves for summary judgment on the administrative record pursuant to Fed.R.Civ.P. 56 and *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir.2003). Oral argument was heard on June 9, 2006, in Utica, New York. Decision was reserved.

### II. *FACTS*

**Glockson** was working as an office manager in September 1999 when she left employment due to back problems, pain and lack of stamina. Plaintiff submitted a claim for benefits under the disability insurance policy provided by her employer as part of her compensation package. The policy is administered by First Unum. Plaintiff began receiving disability benefits in March of 2000, at the expiration of the policy's 180-day elimination period.

Plaintiff's policy pays twenty-four months of benefits if she is disabled from her regular occupation.

(Docket No. 24, Administrative Record ("AR ---"), p. 634.) After twenty-four months, the policy pays if she is disabled from working at any gainful occupation for which she is reasonably fitted by education training or experience on a part-time basis. (AR 634.) "Gainful occupation" is defined as one which can be expected to provide plaintiff with an income at least equal to her gross disability payment within twelve months of her return to work. (AR 633.)

In the same month that **Glockson** began receiving benefits (March 2000) she participated in a comprehensive evaluation of her occupational capacity. This "ERGOS" evaluation was conducted by physical therapist, William Blunden ("Blunden"). It was determined that plaintiff was totally disabled-unable to perform even sedentary work for four hours per day because of severe limitations in all job functions. (AR 172.) Plaintiff was unable to sit longer than five minutes without needing to change positions and stand. She also demonstrated very poor endurance in activities such as stooping, kneeling, crouching and reaching. (AR 158.) Blunden explained that

[plaintiff] was willing to attempt all activities that were presented to her but due to ROM and strength limitations was unable to perform many of the tests ... [He] noted very consistent efforts during this evaluation and there was no exaggeration of symptoms or pain levels. In fact [plaintiff] realized that a pain level of 10 was extreme pain and stated that she needed to give herself room to worsen and not rate her pain artificially high initially.

(AR 173.) First Unum continued to pay benefits and, in accordance with the policy, required plaintiff to provide proof of continuing disability. (AR 621.)

A year later, in August 2001, a representative of the defendant conducted a field visit to plaintiff's home. (AR 338-43.) Despite plaintiff's claim that she could not climb stairs, the field agent found that she lived on the second floor.[FN1] He arrived early and found her vacuuming, an activity reportedly beyond her capacity, and noted that plaintiff did not exhibit symptoms until she was questioned about them.

> FN1. Plaintiff explained that her housing options are limited due to financial constraints. To make the second-floor setting more manageable plaintiff's brother-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in-law assembled a pulley system to assist her in lifting items to the second floor. (AR 474.)

*2 Plaintiff was seen by First Unum RN, Dennis Caron, the next month. He opined that the determination that she was total disabled was "overly restrictive." (AR 355-56.) However, the following month, in October 2001, plaintiff's treating physician, Dr. Shirley Tuttle-Malone ("Dr.Tuttle-Malone"), continued to report that she was totally disabled. (AR 366-67.) Two months later, in December 2001, plaintiff was seen by First Unum RN, Susan Grove who concluded that there was no clinical evidence to support a finding that plaintiff was totally disabled. (AR 374.)

First Unum scheduled another comprehensive evaluation of her occupational capacity-an independent Functional Capacity Exam ("FCE")-for February 2002. Wendy Alford-Tousley, the physical therapist who administered the test, concluded that plaintiff could not work for four hours of sedentary activity per day, but that this was only a minimum measure of plaintiff's capacity considering her doubts about whether plaintiff exerted full effort during the testing. (AR 446.) The evaluator recommended pain treatment and aqua therapy, but not a work-hardening program. (AR 446.)

The next month, in March 2002, First Unum's consulting physician, Dr. Barry Gendron ("Dr.Gendron"), reviewed plaintiff's file. He concluded that the record did not support a finding of total disability and opined that she could work in a full-time sedentary capacity because, according to the FCE, she could sit for most of the day. (AR 442.) First Unum then scheduled plaintiff for an Independent Medical Examination (IME) with John D. Thomas, II, M.D. ("Dr.Thomas").

Dr. Thomas examined plaintiff and issued a report in May 2002. (AR 466-80.) He concluded that plaintiff could work only two hours per day in a sedentary capacity. (AR 466.) He stated that his examination findings were in agreement with the diagnostic testing and imaging reports in the record and that the objective findings supported her work restrictions and limitations. (AR 470.)

In regard to management of plaintiff's fibromyalgia symptoms he stated: "I believe that there is some room for improvement here. Whether it will re-establish full-time sedentary duty workability remains to be seen." (AR 470.) In addition, First Unum had requested that Dr. Thomas make observations as to any of plaintiff's behaviors that were unusual, unexpected or inconsistent. In that vein, Dr. Thomas noted: "I saw, heard, found no inconsistent, unusual, unexpected behaviors or comments." (AR 470.) Accordingly, defendant continued to pay benefits and monitor plaintiff's claim.

First Unum conducted three days of video surveillance in the fall of 2002 and recorded activities on two of those days-October 23, 2002 and October 24, 2002. Plaintiff was videotaped riding in a car for almost an hour at a stretch while running errands, including getting gas, walking about without apparent difficulty, carrying small packages and going out to lunch. Plaintiff was out and about for four and five hours on those two days. In November 2002, Dr. Gendron reviewed the file again, which now included the video surveillance, and concluded that there was no objective evidence to support the conclusion that she could not work full-time at a sedentary position. (AR 497-99.) Dr. Gendron contacted plaintiff's treating physician, Dr. Tuttle-Malone, and requested that she review and comment on the video surveillance. She made no comment regarding the videotape.

*3 More surveillance was conducted in the spring-on May 15, 2003-which revealed the same higher-than-reported activity as observed in the fall. In July 2003, Dr. Gendron reviewed the file again and opined that plaintiff could work in a sedentary capacity with no lifting of more than ten pounds and no prolonged sitting, standing or walking without position changes. (AR 526-27)

In October 2003, First Unum asked Dr. Thomas, the physician who conducted the IME, to review plaintiff's file again. Some additions had been made to the file during the seventeen months since he had examined plaintiff. It contained Dr. Gendron's recent reports, some notes from Dr. Tuttle-Malone and the surveillance tapes. Upon review of the record, Dr. Thomas changed his opinion of plaintiff's work capacity. While he had previously opined that plaintiff could only work two hours a day in a sedentary capacity, he now reported that she could now work four hours per day in a sedentary capacity. That position must allow for some accommodation however-being able to get up and change positions periodically and avoiding any significant repetitive bending, lifting, kneeling, stooping, crouching, squatting, crawling and climbing. (AR 529.)

First Unum consulted a vocational specialist to determine whether or not such work was available in plaintiff's employment area, determined that she could find work, and discontinued her long-term disability benefits in December 2003. The denial letter relates that First Unum relied on Dr. Tuttle-Malone's notes through October 2003, the video surveillance, Dr. Thomas' revised opinion, and a bone density test. (AR 741.)

First Unum's determination focuses on the discrepancies between plaintiff's reported limitations as of February 2003 and the activities recorded during surveillance. For example, plaintiff had reported that her sister drove her into town to run errands because she was unable to drive long distances, but she is seen driving on the tapes. Plaintiff reported that she used a cane, and the tapes revealed that she did not always use one. Also, she reportedly could not sit for more than fifteen minutes, but the tape revealed a longer drive into town.

**Glockson** appealed the determination by letter dated February 27, 2004. (AR 728-31.) In that letter she also offered explanations for the ostensible discrepancies between her reported symptoms and the activities shown on the surveillance tapes. She concedes some improvement in her stamina and tolerance for driving. Thereafter, she discusses the listed discrepancies, like variable cane use [FN2] and tolerating the full drive into town without stopping. [FN3] Regardless of any improvement, she asserted that she was unable to work four hours per day. (AR 729.)

FN2. Plaintiff explained: "I ordinarily use my cane. When I do not there is some particular reason why I do not. Sometimes it can be simply that I have evaluated the distance I need to go and believe I can make it without the cane and that the cane will be more bother than assistance. For example, when I am going to ride in a powered cart when shopping." (AR 729.)

FN3. Plaintiff explained: "While I do indeed find sitting for 30 to 40 minutes painful and stiffening, it is just as painful to stop the car and get out as it is to wait until I reach my destination to do that." (AR 729.)

In March 2004, First Unum declined to consider plaintiff's appeal of the termination of benefits because it deemed her application untimely. Plaintiff commenced the instant action and defendant moved for judgment on the administrative record on grounds that jurisdiction was lacking due to failure to timely exhaust administrative remedies. In December of 2005, defendant's motion was denied without prejudice and it was directed to consider plaintiff's appeal.

*4 The defendant upheld its determination terminating plaintiff's long-term benefits by letter to plaintiff's counsel dated March 31, 2006. The letter explains: "In reaching our determination, we have relied primarily on (I) surveillance showing that your client was more active than she represented to First Unum that she could be; and (ii) medical and vocational reviews showing there are available gainful occupations for your client." (Docket No. 36, March 31, 2006, Letter to Hector, 2.) Plaintiff now moves for judgment on the administrative record. Defendant argues that the motion should be denied and the complaint dismissed.

### III. *DISCUSSION*

#### A. *Standard of Review under ERISA*

ERISA is silent as to the standard of review to be applied to administrators' benefit determinations. *Celardo v. GNY Auto. Dealers Health & Welfare Trust,* 318 F.3d 142, 145 (2d Cir.2003). The Supreme Court, however, has held that challenges to denials of benefits are "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here, the policy explicitly assigns discretionary authority to First Unum to determine eligibility for benefits and to interpret the terms and provisions of the plan. (AR 640.) "Where a written plan confers upon an administrator the discretionary authority to determine eligibility, a court must view its decisions with a 'strong measure of deference' and may reverse only if the administrator's ultimate conclusions are 'arbitrary and capricious.' " *Armstrong v. Liberty Mut. Life Assur. Co.,* 273 F.Supp.2d 395, 402 (S.D.N.Y.2003) (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995)). The parties do not dispute that the arbitrary and capricious standard applies in the instant case.

"Because review in this context is limited to the record before the administrator at the time of

decision, however, 'the district court sits in effect an as appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious.' " *Henar v. First Unum Life Ins. Co.*, No. 02-CV-1570, 2002 U.S. Dist. LEXIS 17585, 13-14 (S.D.N.Y. Sept. 19, 2002) (quoting *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F.Supp. 783, 791 (E.D.N.Y.1994)*. The administrator's decision is reviewed to determine whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Armstrong, 273 F.Supp.2d at 403* (citing *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir.1995)*).

A decision or interpretation is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan, 52 F.3d at 442.* " 'Substantial evidence' is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance.' " *Id.* (citing *Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir.1995)*).

*5 [A]lthough limited, review of a determination under the arbitrary and capricious standard is more than an perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits. Rather, such a review must include a 'searching and careful' determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary.

*Rizk, 862 F.Supp. at 789.*

### B. *Denial of Benefits*

**Glockson** argues that the determination to discontinue her benefits was arbitrary and capricious in that it rested on Dr. Thomas's revised opinion as to plaintiff's physical capacity.[FN4] She asserts that Dr. Thomas's changing his mind about her work capacity after simply viewing the surveillance tapes is improper because it is not medically reasonable to evaluate a complex medical condition by watching a video. Defendant counters that plaintiff's claim is based on self-reporting, her credibility is determinative, and her reported activity levels are simply inconsistent with the surveillance observations.

FN4. Plaintiff argues in the alternative that First Unum improperly calculated plaintiff's earning capacity under its definition of gainful occupation, rendering the decision arbitrary and capricious. Considering the disposition of this action, it is not necessary to address the argument. However, it is noted that this action is considered in an appellate context and the prudential rule of declining to consider arguments for the first time on appeal would apply here regardless. *See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 142 (2d Cir.2000); Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588 (2d Cir.1993).*

As plaintiff points out, despite viewing the surveillance-dated in October 2002 and May 2003- and obtaining Dr. Gendron's review, defendant continued to pay benefits until after Dr. Thomas provided his paper review of the record in October 2003. Indeed, the crux of the determination terminating plaintiff's benefits is First Unum's reliance on Dr. Thomas's interpretation of the three days of surveillance. Thus, the issue is whether Dr. Thomas's opinion offered in reliance on the surveillance tapes constitutes substantial evidence to support defendant's reasoning that plaintiff is capable of working twenty hours per week in a sedentary capacity.

At the time of Dr. Thomas's examination of plaintiff, he reviewed the objective testing in the record and stated that his physical examination findings were in agreement with the diagnostic testing and imaging reports he reviewed. (AR 470.) The record does not indicate subsequent, contradictory objective testing. However, Dr. Thomas determined that plaintiff demonstrate greater physical capacity on the surveillance tapes than she had he observed when he examined her seventeen months earlier. This difference was ostensibly great enough to support the conclusion that plaintiff's work capacity had doubled in duration-from two to four hours per day.

There is, of course, nothing improper in a physician comparing a claimant's behavior on surveillance videotape with claimant's performance in a formal setting. *Billinger v. Bell Atl., 240 F.Supp.2d 274 (S.D.N.Y.2003).* However, the information gleaned is not necessarily dispositive on its face and must be considered within the context of the particular case.[FN5] There are extreme cases where the surveyed activity is so inconsistent with a claimant's reported

limitations that a simple viewing of the surveillance constitutes substantial evidence. For example, in *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1029 (8th Cir.2000), a claimant who was disabled from working as a truck driver due to a herniated disc was videotaped moving about unimpaired, including unloading furniture. That is not the case here. Plaintiff's activities were not conclusively outside the range of activities of someone incapable of sedentary work.

> FN5. Defendant cites *Billinger v. Bell Atl.*, 240 F.Supp.2d 274 (S.D.N.Y.2003), for the proposition that a claims administrator may compare a claimant's behavior on surveillance videotape with claimant's performance in a formal setting. *Id.* at However true, *Billinger* is not persuasive here. The balance of evidence before the administrator in that case did not tip in response to the claimant's surveyed activities. The insurer in that case suspected that the claimant engaged in the self-limiting behavior revealed on the surveillance tape, but the claimant had also exhibited this behavior during three independent medical exams and an FCE. *Id.* at 284. The surveillance tapes were not relied on as substantial evidence of lack of disability in *Billinger* as they are here.

*6 As Dr. Thomas acknowledged in his initial opinion, there is a range of activity which plaintiff might be able to perform which would fall below the threshold of actual work capacity. In discussing plaintiff's capacity in relation to her fibromyalgia, Dr. Thomas noted that plaintiff's condition could improve with treatment, but that improvement may not suffice constitute sedentary duty workability. (AR 471.) It is not credible that the level of improvement revealed by the surveillance-even to the most skeptical eye-would do anything but suggest another assessment of her condition, as opposed to a doubling of her previously assessed capacity.[FN6]

> FN6. Dr. Thomas did not seek to conduct a second or follow-up IME after viewing the videotape. It was arbitrary and capricious not to conduct such an exam before rendering a drastic new evaluation.

In this case, Dr. Thomas should have gathered more information before rendering his opinion. *See e.g.,* *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270 (11th Cir.2002) (surveyed activity was seemingly, conclusively outside the range of reported activity, thus an IME was performed and subsequently relied on.) The type of activity revealed in surveillance is not entirely inconsistent with plaintiff's recognized limitations. To the extent that the surveillance reveals reporting inconsistences, it does not demonstrate any particular level of work capacity.

First, the type of activity revealed in surveillance is not entirely inconsistent with plaintiff's recognized limitations. First Unum and Dr. Thomas knew that plaintiff was able to do some shopping. *See Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173 (8th Cir.2003). Dr. Thomas commented on it in his initial opinion. (AR 474.) He also noted plaintiff's significant patient skills and awareness of the benefits of pacing and energy conservation. (AR 471.) This is consistent with the observation in his second opinion that plaintiff appears to batch up her errands and make numerous stops when she's in town for a morning or afternoon. (AR 529.) Dr. Thomas's opinion consists of his interpretation of plaintiff's behavior and his surmised reasons for her conduct. Notably, the record he reviewed did not contain plaintiff's account of her behavior. Such information would be especially relevant considering that Dr. Thomas had both previously recognized plaintiff's patient skills and apparently found her to be credible when he examined her. He had reported that during his examination he "saw, heard, found no inconsistent, unusual, unexpected behaviors or comments." (AR 470.)

Second, the fact that plaintiff engaged in four to five hours of activity on three separate days, does not undermine all of her reporting. Dr. Thomas's very thorough initial report addressed numerous physical difficulties, some of which are not related to any information gleaned from the surveillance. For example, in his initial report Dr. Thomas noted that plaintiff would have difficultly doing repetitive upper extremity tasks as "[s]he has obvious physical findings about her hands, wrists, and shoulders, which would be severely limiting." (AR 470.) And, after noting her arthritis and fibromyalgia, Dr. Thomas felt compelled to point out that "there are compounding medical issues such as-hypertension, congestive heart failure associated with gouty disease, etc." (AR 471.) It is difficult to infer how the behavior demonstrated by surveillance can support a conclusion that there has been improvement in these areas, which would be relevant even to work in a

sedentary position.

*7 Finally, Dr. Thomas's report is overall simply too conclusory to be of significant weight. For example, as to her ability to sit in the car for long distances, Dr. Thomas commented in his revised opinion that plaintiff tolerated it "apparently fairly well." (AR 529.) Yet, Dr. Thomas's medical opinion does not reveal any consideration of plaintiff's use of pain medication. Neither his opinion nor the surveillance reveal anything about any subsequent pain or fatigue due to the drive-or the outings as a whole for that matter. Reliance on snapshot evaluations, like surveillance, is logically suspect in assessing conditions which result in debilitating pain and/or fatigue following periods of activity. *See Soron v. Liberty Life Assurance Co. of Boston,* No. 02-CV-1514, 2005 WL 1173076, *11 (N.D.N.Y. May 2, 2005).

First Unum has simply cherry-picked medical evidence in the record. Considering the previously credited, and thereafter uncontroverted, objective testing in the record, First Unum's reliance on Dr. Thomas's conclusory review of the file in rescinding plaintiff's benefits was arbitrary and capricious. Plaintiff's motion for judgment on the administrative record will be granted.

### IV. *CONCLUSION*

First Unum's denial of long-term benefits was arbitrary and capricious in that Dr. Thomas's revised opinion does not constitute substantial evidence to support the reasoning that plaintiff can work twenty hours per week in a sedentary capacity.

Accordingly, it is

ORDERED that

1. Plaintiff Carolyn **Glockson's** motion for judgment on the administrative record is GRANTED,

2. Plaintiff is awarded back benefits and First Unum is directed to reinstate her benefits under the policy.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Glockson v. First Unum Life Ins. Co.
Slip Copy, 2006 WL 1877140 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

- 2006 WL 1853763 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Opposition to Plaintiff's Motion for Judgment on the Administrative Record (May 23, 2006) Original Image of this Document (PDF)
- 2005 WL 3683036 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Brief in Further Support of its Motion for Judgment on the Administrative Record (Nov. 3, 2005)
- 2005 WL 2803039 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Support of Its Motion for Judgment on the Administrative Record (Sep. 15, 2005)
- 2004 WL 3665706 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment on the Administrative Record (Oct. 24, 2004)
- 7:04cv00838 (Docket) (Jul. 19, 2004)
- 2004 WL 4072123 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Administrative Record (2004) Original Image of this Document (PDF)

END OF DOCUMENT