1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARCIA STARR-GORDON,

                                    NO. CIV. S-03-68 LKK/GGH
11          Plaintiff,

12       v.

13   MASSACHUSETTS MUTUAL LIFE              O R D E R
     INSURANCE COMPANY, a
14   Massachusetts corporation,

15          Defendant.
     _____/
16

17       Plaintiff Marcia Starr-Gordon alleges that she suffered an

18   injury to her right shoulder and lower back that forced her to

19   stop working as a dental hygienist.  Defendant Massachusetts

20   Mutual Life Insurance Company ("MassMutual") terminated her

21   claim for disability benefits.  In response, plaintiff brought a

22   claim alleging eight causes of action: (1) violation of the

23   California Unfair Competition law, (2) breach of contract, (3)

24   breach of the implied covenant of good faith and fair dealing

25   (bad faith), (4) intentional misrepresentation, (5) negligent

26   misrepresentation, (6) intentional infliction of emotional

                                1

distress, (7) negligent infliction of emotional distress and (8)
declaratory relief.  MassMutual now moves for summary judgment
with respect to counts one through seven of plaintiff's
complaint.  The court resolves the matter based on the parties'
papers and after oral argument.

---

# I. Facts[1]

Defendant issued a disability insurance policy to plaintiff
in 1991.  The policy provided plaintiff with monthly income and
waiver of premium benefits if plaintiff became disabled.  A
"disability" was defined in the policy as:

> an incapacity of the insured which 1) is due to injury
> or sickness; and 2) begins while this Policy is in
> force, and 3) requires care by or at the discretion of
> a legally qualified physician, unless we are furnished
> with proof, satisfactory to us, that future care would
> be of no use; and 4) reduces the insured's ability to
> work and 5) causes loss of earned income.

Decl. of Robert Pohls ("Pohls Decl.") ¶ 2, Ex. 2.

## A. Plaintiff's Alleged Disability

In early December of 2000, plaintiff notified defendant of
her disability claim.  She claimed that, due to the repetitive
nature of her job, she had injured her right shoulder and lower
back.  At the time, plaintiff was working part-time as a dental
hygienist in her husband's dental office.  Defendant then sent
plaintiff the necessary forms required for processing her claim,
including an Occupational Description, a Disability Income

---

[1]The facts are undisputed unless otherwise noted.

Claimant's Statement (the "Statement"), and an Attending
Physician Statement ("APS"), which was to be completed by her
doctors.

In January of 2001, plaintiff submitted the completed
Statement and the Occupational Description. She claimed that
she was partially disabled beginning on January 7, 2000, when
she reduced her work schedule from three to two days a week, and
that she became totally disabled on December 28, 2000, when she
stopped working altogether. In her income statement, plaintiff
complained that she was unable to lift her right arm for "any
length of time." Pohls Decl. ¶ 5, Ex. 4.

In the above-referenced documents, plaintiff specified that
her duties at work included: cleaning teeth, scaling, probing,
polishing, x-rays, and root planing. She indicated that her
duties also required standing, reaching, walking, pushing,
balancing, sitting, bending, and lifting ten pounds or less.
She described her daily activities since the alleged disability
as "[h]ousehold chores not involving right arm and back." Id.

According to the APS submitted by plaintiff's chiropractor,
Dr. Patterson, plaintiff suffered from "thoracic subluxation and
degenerative shoulder disease." Pohls Decl. ¶ 6, Ex. 5. Dr.
Patterson reported that plaintiff's symptoms first appeared on
January 22, 1999. He indicated that plaintiff was unable to
work from January 7, 2001, and that she had "difficulty lifting
her right arm with pain, especially after repetitive motions
that preclude[d] right upper extremity movement." Id.

1  Moreover, he determined that the condition was likely to be
2  permanent.  Id.  In a letter dated March 14, 2001, Dr.
3  Patterson's office sent defendant a letter indicating that there
4  was a typographical error in his original APS and that
5  plaintiff's disability began in January 2000, rather than
6  January 2001, as previously indicated.

7      Dr. Hughes, plaintiff's treating orthopedist, also
8  submitted an APS to defendant on January 5, 2001.  He concluded
9  that plaintiff was able to work with limitations, but was
10 permanently disabled as a dental hygienist.  Id.  Subsequently,
11 treatment notes received from Dr. Hughes showed that on January
12 24, 2001, plaintiff "had what appears to be an optimistic result
13 from the steroid injection on her right shoulder."  Pohls Decl.
14 ¶ 10, Ex. 9.  These notes stated that "[t]he pain in
15 [plaintiff's] shoulder is basically minimal particularly after
16 the steroid injection . . .  Back pain is minimal.  She stopped
17 taking Celebrex and will be taking Advil."  Id.

18 **B. Defendant's Investigation**

19     **1. Pre-Termination Activities**

20     On January 30, 2001, defendant wrote plaintiff informing
21 her of the need for additional information since plaintiff
22 sought coverage for partial disability dating back one year
23 prior to the date she submitted her claim.  On March 8, 2001,
24 defendant informed plaintiff that, although Dr. Patterson
25
26

4

1   certified plaintiff's disability as of January 2001,[2] additional

2   information was necessary to substantiate her claim for partial

3   disability beginning in January 2000.

4        In March 2001, Dr. Hacker, a chiropractor and member of

5   MassMutual's medical and vocational department, reviewed

6   plaintiff's claim file and concluded that although "Ms. Starr

7   may have incurred some restrictions and limitations on her right

8   shoulder/lower back activity beginning about December 18, 2000,"

9   he needed additional information from plaintiff's doctors to

10  better assess plaintiff's injuries.  Pohls Decl. ¶ 12, Ex. 11.

11  Dr. Hacker's assessment pointed out that Dr. Patterson had seen

12  plaintiff 55 times between 1999 and 2001, but that none of Dr.

13  Patterson's treatment notes were included in the materials Dr.

14  Hacker had for review.

15       Defendant subsequently requested treatment notes from Dr.

16  Patterson relating to the period that plaintiff claimed partial

17  disability.  Defendant was told that Dr. Patterson did not have

18  treatment notes but that he would provide a narrative, which

19  defendant requested.  Dr. Patterson then sent defendant a one-

20  page medical narrative, which plaintiff concedes did not provide

21  specific information regarding his treatment during plaintiff's

22  period of partial disability.

23       Shortly thereafter, Darci Stevens, defendant's disability

24  _____

25       [2]At this time, Dr. Patterson's office had not yet sent
    defendant the letter correcting the start date of plaintiff's
    partial disability from January 2001 to January 2000.  This letter
26  was sent March 14, 2001, six days later.

                                  5

1  claims representative, authorized surveillance of plaintiff to
2  determine the extent of her injuries.  However, by letter dated
3  July 10, 2001, defendant accepted plaintiff's disability claim
4  under a reservation of rights, retroactive to December 18, 2000.
5  The letter stated, "you are claiming total disability but it
6  appears as though you may have some capacity to work. . . . [W]e
7  are continuing to investigate your claim."  Pohls Decl. ¶ 16,
8  Ex. 15.  With regard to plaintiff's alleged partial disability,
9  defendant stated that it was denying the claim because it was
10 unable to verify the condition.  Id.

11      Plaintiff's file was then transferred to Paul Montanari for
12 active claim management.  Montanari requested that plaintiff
13 submit to a functional capacity evaluation ("FCE"), which would
14 measure plaintiff's physical capacity in light of her claimed
15 restrictions and limitations.  Defendant scheduled an FCE for
16 plaintiff, which was to take place in September 2001.  However,
17 plaintiff indicated that she would not submit to an examination
18 unless it was performed by a medical doctor, rather than a
19 physical therapist.

20      Meanwhile, the surveillance commissioned by defendant
21 captured plaintiff engaging in the following activities:

22      •    sweeping her driveway while using her right arm to
            sweep and her left arm to hold a dustbin
23      •    jogging up her sidewalk after emptying a dustbin in
            the lot next door
24      •    reaching above her head with her right hand to lift an
            ice chest off the top of a refrigerator and bending to
25           place it on the floor
        •    lifting an ice chest to carry it across her garage
26      •    jumping over her garage door sensor

                                6

- running down her driveway
- carrying groceries with both arms, picking them up out of her shopping cart and loading them in and out of her car
- holding a wireless phone between her head and neck, while using both arms to unload groceries from her car
- installing a car seat in her car, bending over to pick up a child, and lifting the child into her car
- strapping the child into a car seat using both arms, while twisting and bending as necessary to talk to a nearby neighbor, and
- carrying the child on her left hip

Montanari Dep., Pohls Decl. ¶ 17, Ex. 16.

On October 8, 2001, Montanari submitted the surveillance reports to Dr. Feingold, a physiatrist hired by defendant as an outside expert consultant. Based on these reports, Dr. Feingold concluded, "The surveillance reviewed fails to document any of the impairments that the insured is reported to have. Overall the visual impression of the patient is of a healthy and physically active woman with no particular limitations in the upper extremity abilities." Pohls Decl. ¶ 20, Ex. 19. Plaintiff argues that the report is misleading, in that it assumes facts not in evidence, and that it "speaks for itself," but offers no further explanation. Pl.'s Response to Def.'s SUF ¶ 38.

**2. Post-Termination Activities**

On December 14, 2001, defendant sent a letter notifying plaintiff that she would no longer be receiving disability benefits. The letter stated that her policy was being placed back on premium paying status, because defendants' review of plaintiff's activities and her medical records did not support

7

1   the claimed restrictions and limitations.  Plaintiff's counsel

2   notified defendant that plaintiff wished to appeal defendant's

3   decision.

4        In a letter dated December 28, 2001, defendant communicated

5   to plaintiff's counsel that it would "look forward to receiving

6   any information you may submit that will help us better

7   understand her claimed limitations and restrictions."  Pohls

8   Decl. ¶ 27, Ex. 26.  Defendant did not receive additional

9   records from plaintiff until October 11, 2002.  Upon receipt of

10  additional documents, defendant asked Dr. Feingold to review

11  plaintiff's updated claim file.  Dr. Feingold concluded that:

12          The medical records to date do not show any change in
            the patient's medical condition. . . . The types of
13          activities   that   were   described   as   causing   her
            difficulty at work are similar in part to activities
14          she was seen doing in day-to-day activities of daily
            living, based on her surveillance.  It is not clear
15          whether she does or does not have pain in her right
            shoulder, but it does appear she is not obtaining
16          active medical care for this, nor is she particularly
            restricted in the daily activities, as documented on
17          her surveillance.

18  Pohls Decl. ¶ 23, Ex. 22.  Plaintiff, however, notes that these

19  additional documents did not include the 2002 medical records

20  from Dr. Hughes and Dr. Patterson.  Feingold Tr. at 155:4-12,

21  Aff. of Dean Burnick ("Burnick Aff.") ¶ 7, Ex. 7.

22       In December 2001, plaintiff claimed that she once again

23  began to experience intense feelings of anxiety, panic, anger,

24  mood swings, helplessness, and depression.  Her symptoms

25  increased steadily over time until she found it necessary, in

26  March 2002, to return to her treating psychiatrist.  Since that

1  time, plaintiff claims that she has been taking daily dosages of
2  Celexa, an antidepressant.  Despite being on notice about
3  plaintiff's psychological condition, Montanari testified that he
4  did not consider the impact that surveillance actions might have
5  on plaintiff.  Montanari Tr. at 302:10-303:9, Burnick Aff. ¶ 3,
6  Ex. B.

7      Finally, on December 12, 2002, plaintiff filed her
8  complaint, giving rise to the present action.  Since that time,
9  defendant has obtained an independent medical examination
10  ("IME") of plaintiff.  In April 2006, Dr. Schiff conducted a
11  physical examination, which revealed that "there are subjective
12  complaints without objective foundation" with regard to her neck
13  and shoulder, and that her back pain would not prevent her from
14  performing non-heavy labor.  Schiff Rep., Pohls Decl. 34, Ex.
15  33.  In May 2006, Dr. O'Brien, a psychiatrist, also examined
16  plaintiff and reported that individuals with plaintiff's profile
17  pattern have an interest in portraying themselves as physically
18  disabled.

19                       **II.  STANDARDS**

20      Summary adjudication, or partial summary judgment "upon all
21  or any part of a claim," is appropriate where there is no
22  genuine issue of material fact as to that portion of the claim.
23  Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 (9th Cir. 1981)
24  ("Rule 56 authorizes a summary adjudication that will often fall
25  short of a final determination, even of a single claim")
26  (citations omitted); Playboy Enters., Inc. v. Welles, Inc., 78

F. Supp. 2d 1066, 1073 (S.D. Cal. 1999), <u>aff'd in part, rev'd in</u>
<u>part, on other grounds</u>, 279 F.3d 796 (9th Cir. 2002); E.D. Local
Rule 56-260(f). Under summary judgment practice, the moving
party

> always bears the initial responsibility of informing
> the district court of the basis for its motion, and
> identifying those portions of 'the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if
> any,' which it believes demonstrate the absence of a
> genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here
the nonmoving party will bear the burden of proof at trial on a
dispositive issue, a summary judgment motion may properly be
made in reliance solely on the 'pleadings, depositions, answers
to interrogatories, and admissions on file." <u>Id.</u>  Indeed,
summary judgment should be entered, after adequate time for
discovery and upon motion, against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial. <u>See id.</u> at 322.  "[A]
complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial." <u>Id.</u>  In such a circumstance, summary judgment
should be granted, "so long as whatever is before the district

10

1  court demonstrates that the standard for entry of summary

2  judgment, as set forth in Rule 56(c), is satisfied." Id. at

3  323.

4      If the moving party meets its initial responsibility, the

5  burden then shifts to the opposing party to establish that a

6  genuine issue as to any material fact actually does exist.

7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

8  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.

9  Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

10     In attempting to establish the existence of this factual

11 dispute, the opposing party may not rely upon the denials of its

12 pleadings, but is required to tender evidence of specific facts

13 in the form of affidavits, and/or admissible discovery material,

14 in support of its contention that the dispute exists. See Fed.

15 R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also

16 First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d

17 952, 954 (9th Cir. 1998). The opposing party must demonstrate

18 that the fact in contention is material, i.e., a fact that might

19 affect the outcome of the suit under the governing law, Anderson

20 v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

21 No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,

22 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

23 Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

24 that the dispute is genuine, i.e., the evidence is such that a

25 reasonable jury could return a verdict for the nonmoving party,

26 Anderson, 477 U.S. 248-49; see also Cline v. Industrial

11

1   Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228

2   (9th Cir. 1999).

3       In the endeavor to establish the existence of a factual

4   dispute, the opposing party need not establish a material issue

5   of fact conclusively in its favor.  It is sufficient that "the

6   claimed factual dispute be shown to require a jury or judge to

7   resolve the parties' differing versions of the truth at trial."

8   First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv.,

9   809 F.2d at 631.  Thus, the "purpose of summary judgment is to

10  'pierce the pleadings and to assess the proof in order to see

11  whether there is a genuine need for trial.'"  Matsushita, 475

12  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

13  note on 1963 amendments); see also International Union of

14  Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

15  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

16      In resolving the summary judgment motion, the court

17  examines the pleadings, depositions, answers to interrogatories,

18  and admissions on file, together with the affidavits, if any.

19  Rule 56(c); See also In re Citric Acid Litigation, 191 F.3d

20  1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

21  is to be believed, see Anderson, 477 U.S. at 255, and all

22  reasonable inferences that may be drawn from the facts placed

23  before the court must be drawn in favor of the opposing party,

24  see Matsushita, 475 U.S. at 587 (citing United States v.

25  Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)); See also

26  Headwaters Forest Defense v. County of Humboldt, 211 F.3d 1121,

1   1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

2   out of the air, and it is the opposing party's obligation to

3   produce a factual predicate from which the inference may be

4   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

5   1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

6   Cir. 1987).

7        Finally, to demonstrate a genuine issue, the opposing party

8   "must do more than simply show that there is some metaphysical

9   doubt as to the material facts. . . . Where the record taken as

10  a whole could not lead a rational trier of fact to find for the

11  nonmoving party, there is no 'genuine issue for trial.'"

12  Matsushita, 475 U.S. at 587 (citation omitted).

**III. ANALYSIS**

14       Defendant has moved for summary judgment with respect to

15  the following claims: (1) violation of the California Unfair

16  Competition Law, (2) breach of contract, (3) breach of the

17  implied covenant of good faith and fair dealing (bad faith), (4)

18  intentional misrepresentation, (5) negligent misrepresentation,

19  (6) intentional infliction of emotional distress, (7) negligent

20  infliction of emotional distress, and (8) punitive damages.

21  **A.  California Unfair Competition Law**

.22      MassMutual first moves for summary judgment with respect to

23   plaintiff's representative claims under the California Unfair

24  Competition Law ("UCL").  Cal. Bus. and Profs. Code § 17200 et

25  seq.  Originally, the UCL permitted plaintiffs to bring causes

26  of action on behalf of the general public without first seeking

1  class certification.  In November 2004, however, California

2  voters passed Proposition 64, which requires private parties to

3  obtain class certification prior to bringing a representative

4  action.[3]  See Cal. Bus. & Prof. Code § 17203; see also Cal. Code

5  Civ. P. § 382 (setting forth the requirements for class action

6  certification).

7      In plaintiff's opposition papers,[4] plaintiff has stated her

8  intent to abandon any representative claims under the UCL, and

9  there is no dispute that plaintiff has not complied with class

10 certification requirements.  Nonetheless, as she correctly

11 notes, she is still entitled to pursue her individual action

12 under the UCL.  See Cal. Bus. & Prof. Code § 17204 ("Actions for

13 relief pursuant to this chapter shall be prosecuted . . . by any

14 person who has suffered injury in fact and has lost money or

15 property as a result of such unfair competition.").  Defendant's

16 attempt in its reply brief to address whether MassMutual has

17 engaged in unfair business practices with regard to plaintiff's

18 individual action comes too late.

19 _____

20     [3] The court continued MassMutual's initial motion for summary
   judgment, as this case was pending at the time of Proposition 64's
21 passage, and the California Supreme Court had yet to rule on cases
   addressing the applicability of Proposition 64 to cases pending
22 during its passage.  Since then, the California Supreme Court has
   decided that Proposition 64 indeed applies to cases pending at the
23 time of its passage.  See California for Disability Rights v.
   Mervyn's LLC, 39 Cal. 4th 223 (2006); Branick v. Downey, Savings
24 and Loan Ass'n, 39 Cal. 4th 235 (2006).

25     [4] Pursuant to Federal Rule of Evidence 201, and in response
   to plaintiff's request, the court takes judicial notice of all
26 papers on file in this case.

14

1    MassMutual also contends that disgorgement of profits,
2  which plaintiff seeks in her complaint, is not an available
3  remedy under the UCL.  Compl. ¶ 95 ("Mass Mutual is liable to
4  provide restitution to the Plaintiff/insured and is required
5  under law to effect a disgorgement of all profits made from its
6  illicit business practices . . .").  Although the UCL affords a
7  broad range of remedies, non-restitutionary disgorgement of
8  profits is not among them.  See Korea Supply Co. v. Lockheed
9  Martin Corp., 29 Cal. 4th 1134 (2003).  Typically, when a
10  defendant is ordered to disgorge profits, it must surrender all
11  money obtained through the illegal business practice, including
12  money not obtained from plaintiffs.  The UCL does not permit
13  this.  Rather, disgorgement is permissible "only to the extent
14  that it constitutes restitution."  Id. at 1145.  Tellingly,
15  plaintiff does not respond to MassMutual's on this point.

16    Because plaintiff has abandoned her representative UCL
17  claim, and there is no genuine dispute that non-restitutionary
18  disgorgement is not an available remedy under the UCL, summary
19  judgment is proper as to the claim for disgorgement.
20  Nonetheless, of course, plaintiff may pursue her individual
21  action to the extent she seeks disgorgement of money defendant
22  improperly obtained from her.

23  **B. Breach of Contract**

24    Defendant next argues that plaintiff's claim for breach of
25  contract should fail as a matter of law because she has failed
26  to demonstrate coverage for her claim.  The issue of coverage is

15

1  a question of law that the court may adjudicate on summary

2  judgment.  Waller v. Truck Ins. Exchange Co., 11 Cal. 4th 1, 18

3  (1995).  For the reasons set forth below, the court denies

4  defendant's motion on this claim.

5       As noted earlier, the policy defines disability as "an

6  incapacity of the insured which "(1) is due to injury or

7  sickness; and (2) begins while this policy is in force; and (3)

8  requires care by or at the direction of a legally qualified

9  physician . . . and (4) reduces the insured's ability to work;

10 and (5) causes a loss of earned income."  Pohls Decl. ¶ 2, Ex.

11 2.  For purposes here, the issue in dispute is the fourth

12 criterion — that is, whether plaintiff's injury reduces her

13 ability to work.

14      Defendant maintains that California law provides the

15 controlling definition of disability, whereas plaintiff

16 maintains that, based on the plain language of the policy,

17 plaintiff's injury has reduced her ability to work.[5]  Defendant

18 places heavy reliance on  Erreca v. Western States Life Ins.

19 Co., 19 Cal. 2d 388 (1942).  However, contrary to defendant's

20 assertion, the definition of disability in Erreca does not

21 supplant every definition of disability in all insurance

22

23      [5] There is some dispute as to whether plaintiff changed her
   position on this issue during the course of litigation.  Defendant
   argues that plaintiff initially took the position that California
24 law supplied the definition of disability in her responses to
   interrogatories.   Pl.'s Supp. Responses to Def.'s Second Set of
25 Interrogatories at 11.  However, plaintiff's present position — and
   the one the court addresses — is that the court should examine the
26 plain language of the contract.

16

1   policies.[6]  Accordingly, the court finds that <u>Erreca</u>

2   inapplicable to the facts of the present case.

3       "The rules governing policy interpretation require us to

4   look first to the language of the contract in order to ascertain

5   its plain meaning or the meaning a layperson would ordinarily

6   attach to it."  <u>Waller</u>, 11 Cal. 4th at 18; <u>see</u> <u>also</u> Cal. Civ.

7   Code § 1638 (plain meaning controls where language is

8   unambiguous and does not lead to an absurd result).  The policy

9

10      [6] <u>Erreca</u> merely stands for the proposition that California
    courts should interpret the meaning of total/general disability in
11  a practical rather than literal fashion.  Prior to <u>Erreca</u>, some
    courts had held that under "general disability" policies, an
12  insured could only obtain benefits upon proof that the insured was
    unable to perform the work of any occupation.  <u>Id.</u> at 394.  This
13  was in contrast to "occupational disability" policies, which
    provided benefits so long as the insured was unable to perform the
14  work that was engaged in at the time the policy was written.  <u>Id.</u>
    at 393.  <u>Erreca</u> tempered the harshness of "general disability"
15  policies by holding that, where an insured is prevented from
    pursuing other employment in light of his capabilities and station
16  in life (e.g., level of education).  Benefits may be obtained even
    though other employment is theoretically possible.
17      Where <u>Erreca</u> applies, the plaintiff is required to prove that
    these other employment options are effectively foreclosed, which
18  Starr-Gordon has not done here.  <u>Erreca</u> does not, however, insert
    this definition of "total disability" into every policy, as
19  defendant maintains.  Tellingly, <u>Erreca</u>'s recitation of the
    language typically employed in a general disability clause does not
20  resemble that found in plaintiff's policy.  <u>Id.</u> at 393 ("[A]
    general disability clause defines total disability to mean
21  'whenever the insured is wholly incapacitated from performing any
    work whatsoever for remuneration or profit.'").
22      There is no reason why every insurance policy must fit into
    the categories of either general disability or occupational
23  disability, and defendant has not cited any authority to the
    contrary.  For example, there are also "disability income" policies
24  that focus on whether an injury that reduces an insured's ability
    to work also causes a loss of earned income.  These policies do not
25  generally identify any specific occupation.  Aff. of Mary Fuller,
    ¶¶ 1-5, 7, Ex. A.
26

17

here is unambiguous, and, as MassMutual points out, any policy
accepted and approved by the California Insurance Commissioner
is conclusively presumed to be unambiguous.  Cal. Ins. Code §
10291.5.  Accordingly, the plain meaning of the policy
determines whether plaintiff is covered.

Plaintiff has tendered sufficient evidence to prove that,
at a minimum, there is a genuine dispute that she experienced a
reduced ability to work as a dental hygienist.  On this basis
alone, defendant's motion for summary judgment with respect to
the breach of contract issue must be denied.  Under the plain
meaning of the policy, if plaintiff has a reduced ability to
perform the job that she was engaged in at the time of her
injury, she has satisfied the policy requirement of a reduced
"ability to work."  The court need not go further than this in
order to resolve the present dispute.[7]

Defendant's contention that only the purchase of a "Regular
Occupation Rider" would have provided plaintiff with coverage
for occupational disability is unavailing.  Its existence does
not alter the plain meaning of the policy, and the intentions of
contracting parties will generally be discerned from only the
written provisions of the contract itself.  <u>Waller</u>, 11 Cal. 4th
at 19.  Moreover, the rider appears to provide the insured with

_____

[7] The court notes that even if there was an ambiguity in the
policy, plaintiff would be entitled to coverage so long she could
demonstrate that her interpretation of the policy was objectively
reasonable.  <u>Bank of the West v. Superior Court of Contra Costa
County</u>, 2 Cal. 4th 1254, 1264-65 (1992).

1   a more generous calculation of benefits; it does not suggest

2   that policies without the rider deny coverage altogether when

3   the insured is only disabled from performing one particular job.

4        As there is a genuine dispute as to whether plaintiff is

5   disabled within the meaning of the policy, defendant's motion

6   for summary judgment as to the breach of contract claim is

7   denied.[8]

8   **C.   Breach of the Implied Covenant of Good Faith and Fair**

9   **Dealing**

10        Defendant maintains that plaintiff's bad faith claim fails

11  because she has not demonstrated that she is entitled to

12  benefits under the policy and that there is a genuine dispute as

13  to coverage.  For the reasons set forth below, summary judgment

14  should be granted with respect to plaintiff's bad faith claim.

15        There is an implied covenant of good faith and fair dealing

16  in every insurance contract.  White v. Western Title Ins. Co.,

17  40 Cal. 3d 870, 885 (1985).  In order to establish bad faith, or

18  breach of the implied covenant of good faith and fair dealing, a

19  plaintiff must show that benefits due under the policy were

20  withheld, and that the reason for withholding benefits was

21  unreasonable or without proper cause.  Love v. Fire Ins.

22  ─────────────────

23        [8] Plaintiff asks that the court sua sponte enter judgment in
    her favor on the breach of contract claim.  While the court has the
24  ability to do so even when there is no cross-motion for summary
    judgment, Gospel Missions of America v. City of Los Angeles, 328
25  F.3d 548, 553 (9th Cir. 2003), it is inappropriate here.  The
    definition of disability in the policy includes five elements, only
26  one of which defendant has fully briefed in its papers.

1  Exchange, 221 Cal. App. 3d 1136, 1151 (4th Dist. 1990); Guebara

2  v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2002)

3  (applying California law).  "The key to a bad faith claim is

4  whether denial of a claim was unreasonable."  Id.  Even though

5  bad faith is typically a question of fact for the jury, if a

6  defendant's conduct is objectively reasonable, then its

7  subjective intent is irrelevant.  Morris v. Paul Revere Life

8  Ins. Co., 109 Cal. App. 4th 966, 973 (4th Dist. 2003) ("[I]f the

9  conduct of [the insurer] in defending this case was objectively

10 reasonable, its subjective intent is irrelevant.").

11      A court may dismiss a bad faith claim on summary judgment

12 if the defendant can demonstrate that there was a genuine

13 dispute as to coverage.  Guebara, 237 F.3d at 992 (describing

14 the "genuine dispute doctrine"); Amadeo v. Principal Mut. Life

15 Ins. Co., 290 F.3d 1152, 1162 (holding that summary judgment is

16 proper where it is indisputable that the basis for an insurer's

17 denial of benefits was reasonable).  It is not unreasonable for

18 an insurer to resolve good faith doubts, whether factual or

19 legal, against the insured.  Blake v. Aetna Life Ins. Co., 99

20 Cal. App. 3d 901, 924 (4th Dist. 1979).  Therefore, in the

21 present posture, the court may grant the defendant summary

22 judgment if no reasonable jury could disagree that there is a

23 genuine dispute that plaintiff was entitled to benefits.

24      Even if defendant was ultimately wrong to terminate

25 benefits -- which is the issue in the breach of contract claim -

26 - that is a distinct issue from whether defendant acted in bad

faith.  <u>Chateau Chamberay Homeowners Ass'n v. Associated Intern.</u>
<u>Ins. Co.</u>, 90 Cal. App. 4th 335, 347 (2d Dist. 2001) (noting that
liability for breach of contract and bad faith are not
coterminous).  To illustrate the difference in standards, if the
court finds that there is a reasonable and genuine dispute as to
whether plaintiff was disabled within the meaning of the policy,
it must grant summary judgment as to the bad faith claims, and
deny summary judgment as to the breach of contract claim.

Broadly, defendant's alleged bad faith acts can be divided
into two categories: bad faith related to the termination of
benefits and bad faith related to the investigation process of
plaintiff's claim.  The court addresses each in turn.

**1. Termination of Benefits**

Defendant cites to multiple reasons for why its decision to
terminate plaintiff's benefits were reasonable under the
circumstances.  First, plaintiff waited for over a year to make
her claim.  Second, the evidence ultimately produced to document
plaintiff's claim (e.g., Dr. Patterson's narrative report) was
equivocal and suggested that plaintiff's symptoms might improve.
Third, video surveillance, and the reports of medical
consultants reviewing that footage, reveal that plaintiff's
claims of injury were false or exaggerated.

Plaintiff responds in two ways.  First, she notes that the
reasonableness of an insurer's decisions and actions must be
evaluated based on the information that it had at the time the
decisions were made -- not based on information acquired

1   afterwards.[9]  See Chateau Chamberay, 90 Cal. App. 4th at 347;

2   see also Filippo Industries, Inc. v. Sun Ins. Co. of New York,

3   74 Cal. App. 4th 1429, 1441 (2d Dist. 1999).  For example, if an

4   insurer unreasonably denied benefits in the first instance, it

5   could not shield itself from liability by merely conducting

6   medical examinations at some future date when the insured's

7   health condition had improved.

8        Defendant responds that it should not be limited to

9   information in existence at the time plaintiff's benefits were

10   terminated because she has a continuing claim of disability

11   (i.e., if her disability disappears at any time, so too do her

12   benefits).  Furthermore, at least some of the subsequently

13   acquired information consisted of evaluations of medical records

14   already in existence at the time benefits were terminated,

15   rather than ones reflecting plaintiff's condition at a future

16   date.  However, the court need not rule on defendant's

17   continuing disability argument because, as described below, it

18   finds that defendant had a reasonable basis for terminating

19   benefits based on information available as of the date of

20   termination.

21        Second, plaintiff disputes the substance of defendant's

22   reasons for termination.  As defendant points out, however, the

23

24        [9] If the court were to permit defendant to rely on information
     acquired after it decided to terminate benefits, it is highly
25   likely  that  defendant's  decision  would  be  deemed  reasonable,
     particularly  in  light  of  the  reports  from  Dr.  Schiff  and  Dr.
26   O'Brien.

1  very existence of a reasonable dispute precludes a finding of

2  bad faith.  For example, Dr. Hughes' treatment notes indicated

3  that plaintiff was responding well to a steroid injection and

4  that her back might improve with rest.  Moreover, the

5  surveillance footage corroborates this, as plaintiff was seen

6  using her right hand and leaning over without any apparent

7  difficulty.  In addition, defendant had both Dr. Hughes' APS and

8  the surveillance results at the time it terminated benefits.

9      To be sure, not all of the activities caught on the

10  surveillance footage would necessarily indicate an ability to

11  perform the fine motor skills required of a dental hygienist,

12  which is the critical issue given the court's construction of

13  the policy.  However, plaintiff's apparent ability to engage in

14  gross motor movements contradict her previous statements,

15  calling into doubt the veracity of her claims as a general

16  matter.  This doubt remains even if the movements were not

17  analogous to those required of a dental hygienist.

18      Furthermore, plaintiff stated that the use of her right arm

19  would allow her to return to work.  The surveillance video can

20  reasonably be read to show her using her arm.  Burnick Aff., Ex.

21  B at 404:16-19.  Of course, plaintiff is not a medical

22  professional, and she might have incorrectly assessed her own

23  condition.  Nevertheless, plaintiff was also intimately familiar

24  with her job functions and the movements that caused her

25  discomfort; accordingly, her statement is entitled to some

26  weight.

1    At oral argument, plaintiff's counsel argued that the

2 genuine dispute doctrine is limited to situations where there

3 are serious evidentiary disputes, as when parties offer the

4 conflicting reports of doctors.  Certainly, the doctrine has

5 been applied in such circumstances.  See, e.g., Allstate Ins.

6 Co. v. Madan, 889 F. Supp. 374, 380 (C.D. Cal. 1995) (finding

7 that dispute between experts as to cause and origin of a fire

8 established genuine dispute and therefore precluded bad faith).

9 However, there is no case law indicating that only conflicting

10 expert reports may give rise to a reasonable factual dispute.

11 Moreover, Dr. Feingold provided defendant with his expert

12 report, which stated that "[t]he surveillance reviewed fails to

13 document any of the impairments that the insured is reported to

14 have."  Pohls Decl. ¶ 20, Ex. 19.  Although Dr. Feingold did not

15 personally examine plaintiff, his report took as an assumption

16 that the diagnoses of plaintiff's doctors were accurate.

17    In light of the foregoing reasons, the court cannot find

18 that the defendant acted unreasonably.  Mr. Montari summarized

19 the evidence relied upon to terminate plaintiff's benefits:

20         So all of that together, the occupational
          description, the inconsistencies in the
21        surveillance tape, the medical reviews, the medical
          records showing improvement from the injection, no
22        treatment for six months, gaps in treatments from
          both Dr. Patterson and Dr. Hughes, Dr. Patterson's
23        statement that there are no current limitations and
          restrictions that rise to a disabling level, Dr.
24        Feingold's, Dr. Hacker's, and Dr. Gordon's reviews
          all raising question to the extent of disability.
25        Me combining all of that with the specifics of this
          case came to the conclusion that she was no longer
26        eligible for benefits.

1    Burnick Aff. Ex. B at 412:24-413:11.  Viewed collectively, the

2    evidence establishes sufficient justification for defendant's

3    termination of benefits such that it cannot be held liable for

4    bad faith.

5         **2. Investigation**

6         Additionally, an insurer breaches the implied covenant of

7    good faith and fair dealing by failing to investigate thoroughly

8    its insured's claim.  Egan v. Mutual of Omaha Ins. Co., 24 Cal.

9    3d 809 (1979); Guebara, 237 F.3d at 996.  An insurer may also be

10   liable for failing to investigate a claim in an unbiased manner.

11   See Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998,

12   1010 (9th Cir. 2004).  This is significant because if the

13   "genuine dispute" discussed above is, for example, based upon

14   expert opinions that were the fruit of a biased investigation,

15   the insurer may still be liable for bad faith.  Here, plaintiff

16   argues that defendant's investigation of her total disability,

17   partial disability, and psychological disability were all

18   deficient in some respect.

19        **a. Total Disability**

20        First, plaintiff alleges that defendant failed to

21   investigate her total disability claim in a thorough and

22   unbiased manner.  Specifically, plaintiff argues that defendant

23   ignored her back condition as a basis for disability, that

24   defendant failed to conduct a timely IME, and that defendant

25   failed to conduct a formal job analysis.  I cannot agree.

26        First, defendant took into consideration plaintiff's back

1   condition.  Dr. Feingold's review discussed plaintiff's back and
2   found that the "cervical and lumbar spine diagnoses, if active,
3   could cause decrease in use of upper extremities," which "was
4   not evident from the surveillance."  Pohls Decl., ¶ 20, Ex. 19.
5   Moreover, Mr. Montanari testified that in reviewing plaintiff's
6   claim, he took into account the records of Dr. Hacker, a
7   chiropractor, as well as Dr. Hughes' opinions regarding
8   plaintiff's back pain.

9        Plaintiff's argument with regard to the IME is also
10   unavailing.  While it is true that defendant did not schedule an
11   IME of plaintiff until 2006, it is also true that defendant
12   attempted to schedule an FCE as early as 2001.  Defendant
13   scheduled the exam, but plaintiff expressed that she would only
14   consent to an examination conducted by a physician rather than
15   a physical therapist.  This distinction, while significant, is
16   not sufficient to establish that defendant abnegated its duty to
17   investigate plaintiff's claim.

18        Plaintiff also argues that defendant's failure to
19   commission a formal analysis of plaintiff's job duties was an
20   act of bad faith.  However, plaintiff overlooks the fact that
21   she filled out a detailed form describing her job functions for
22   defendant.  Pohls Decl., Ex. 4.  This form stated that her
23   duties and activities included teeth cleaning, scaling, root
24   planing, and taking x-rays, and that the maximum weight she was
25   required to lift was ten pounds.  The form also contained a
26   fairly comprehensive checklist of physical movements required by

1  a job and corresponding boxes for the frequency of those

2  movements. Plaintiff argues that the form represented her lay

3  opinion on her job duties, but tellingly, does not dispute the

4  accuracy of the tasks listed. In light of this information, it

5  would not be bad faith for defendant to refrain from conducting

6  a formal job analysis.

7      In general, plaintiff focuses on the investigatory

8  activities that defendant allegedly failed to conduct, but it

9  ignores the activities that defendant in fact ordered. For

10 example, defendant obtained medical reviews from Dr. Feingold

11 and Dr. Hacker, commissioned video surveillance of plaintiff,

12 and reviewed the claim forms submitted by plaintiff as well as

13 what medical records it received from plaintiff's treating

14 doctors. While defendant might have done more to substantiate

15 its ultimate decision, the court cannot find that defendant

16 breached its duty to investigate based on the aforementioned

17 conduct.

18              **b. Partial Disability**

19     Plaintiff further contends that defendant also failed to

20 adequately investigate her claim for partial disability, in

21 which she reduced her work week from three days per week to two

22 days in January 2000. Although, as described above, the duty to

23 investigate typically exists independent of whether there is a

24 reasonable dispute over plaintiff's entitlement to benefits,

25 when the dispute is clearly genuine and non-pretextual, the duty

26 to investigate is correspondingly lower. See Brinderson-Newberg

27

1   <u>Joint Venture v. Pacific Erectors, Inc.</u>, 971 F.2d 272, 283 (9th

2   Cir. 1992) (finding that "an insurer [need] not conduct a more

3   thorough investigation [when] the insurer already has good

4   reason to dispute liability").

5       Here, defendant's investigation was reasonable in light of

6   plaintiff's one-year delay in submitting the claim, the sporadic

7   treatment that plaintiff sought for her condition during that

8   one year period, and the fact that plaintiff's work duties

9   remained unchanged, even though her hours were reduced.  Indeed,

10  even though defendant requested them, Dr. Patterson was unable

11  to provide treatment notes regarding plaintiff's period of

12  partial disability.  His narrative report was similarly silent

13  as to the specific dates of plaintiff's treatment.  Even viewing

14  the evidence in the light most favorable to the plaintiff, it

15  cannot be said that defendant's investigation of the partial

16  disability claim was unreasonable.

17              **c. Psychological Disability**

18      Plaintiff alleges that defendant failed to investigate her

19  psychological disability.  She argues that defendant was on

20  notice of this possibility, as the medical records from Dr.

21  Patterson indicated that she was emotionally fragile, suffered

22  from panic attacks and anxiety, and was taking medication to

23  manage her symptoms.  Defendant has stated that its policy is to

24  investigate all possible concurrent causes of disability.

25      Plaintiff's argument is unavailing.  First, there is no

26  explanation as to how plaintiff's psychological condition might

28

have caused the physical disability, and plaintiff does not allege that the psychological condition itself constitutes a disability within the meaning of the policy. Plaintiff stated that she stopped working in 2000 because of her physical condition, not her psychological condition. Second, in response to the question, "Do you have any other health problems that may be contributing to your difficulties or aggravating your condition?", plaintiff responded "No." Pohls Supp. Decl., Ex. 41. Third, the initial claims examiner on plaintiff's file testified that "I didn't see anything significant that would indicate to me there was a possible disability." Pohls. Supp. Decl., Ex. 44 at 369:5-10 (referring to plaintiff's psychological condition). Accordingly, there is no genuine dispute as to the adequacy of defendant's investigation into plaintiff's psychological disability.

### d. Other Alleged Acts of Bad Faith

Plaintiff submits that defendant engaged in a litany of bad faith acts, which she recites over the course of twenty-two pages in its fifty-six page brief. The court has addressed plaintiff's more serious arguments and finds that the remainder are without merit.

For example, plaintiff maintains that defendant has failed to "give at least as much consideration" to the interests of its insured as to its own interests. As evidence, she points to defendant's institutional practices of communicating the company's financial plan and performance targets to examiners.

1    The inference is that examiners are pressured to deny claims in

2    order to meet these performance targets.  However, by her own

3    admission, plaintiff concedes that it is not improper for an

4    insurance company to maintain and communicate claims handling

5    statistics.  Without a more specific nexus to the facts of the

6    present case, this generic information about defendant's

7    "corporate culture and environment," Pl.'s Opp'n to Def.'s Mot.

8    for Summ. J. at 21, cannot support a claim of bad faith.  The

9    remainder of plaintiff's arguments are similarly without merit.[10]

10       To summarize, defendant's motion for summary judgment as to

11   bad faith should be granted because its decision to terminate

12   plaintiff's benefits was based on at least reasonable disputes

13   regarding plaintiff's medical condition and whether the

14   condition reduced plaintiff's ability to work as defined in the

15   policy.  Furthermore, its investigation of plaintiff's claims

16   (psychological, total, and partial) was reasonable under the

17   circumstances.

18

19        [10] First, plaintiff argues that defendant acted in bad faith
     by failing to reference Erreca in its policy, but, as noted above,
20   that case has no bearing on how to interpret the policy.  Second,
     plaintiff notes that the termination letter failed to identify in
21   detail each activity observed during surveillance and how each
     observed activity was inconsistent with plaintiff's alleged
22   injuries.  However, the insurance code merely requires insurers to
     provide a reasonable explanation of the basis for termination "in
23   relation to the facts," which the court finds that defendant did
     here.  Cal. Ins. Code § 790.03(h)(13).  Third, plaintiff maintains
24   that defendant only gave plaintiff a small window of time after the
     termination letter was sent in order to prevent the lapse of her
25   policy.  However, plaintiff ultimately paid her premium on time,
     and defendant's conduct is not of the magnitude that typically
26   characterizes bad faith actions.

**D. Intentional and Negligent Misrepresentation**

Defendant also moves for summary judgment on plaintiff's intentional and negligent misrepresentation claims. Plaintiff's primary claim is that defendant promised coverage without the intent to provide such coverage, or without a reasonable basis for believing it would provide such coverage. For the reasons set forth below, summary judgment with respect to these claims should be denied.

In California, a cause of action for intentional misrepresentation or fraud requires that the plaintiff to prove the existence of the following: (1) misrepresentation (false representation, concealment, or nondisclosure), (2) knowledge of falsity, (3) intent to deceive or induce reliance, (4) justifiable reliance, and (5) resulting damage. <u>Lazar v. Superior Court</u>, 12 Cal. 4th 631, 638 (1996); <u>Engalla v. Permanente Medical Group, Inc.</u>, 15 Cal. 4th 951, 974 (1997); <u>Glenn K. Jackson Inc. v. Roe</u>, 273 F.3d 1192, 1201 (9th Cir. 2001).

The elements of a cause of action for negligent misrepresentation are similar, except that plaintiff need not prove the element of scienter. <u>Gagne v. Bertran</u>, 43 Cal. 2d 481, 487-88 (1954). Rather, plaintiffs need only prove that the representation was made without a reasonable basis. <u>Glenn K. Jackson Inc.</u>, 273 F.3d at 1201 n.2.

For both claims, plaintiff identifies the same four alleged misrepresentations. First, plaintiff argues that MassMutual

1   represented that it would pay for disability benefits if
2   plaintiff satisfied the terms and conditions of the policy.
3   Second, plaintiff maintains that defendant should have discussed
4   <u>Erreca</u> in the policy.  Third, plaintiff claims that defendant
5   represented that it would schedule an IME when the claim was
6   pending.  Finally, plaintiff avers that defendant misrepresented
7   that her appeal would be timely resolved.

8        The latter three alleged misrepresentations can be resolved
9   summarily.  Plaintiff's contention that defendant should have
10  discussed <u>Erreca</u> is moot, given the interpretation of the policy
11  adopted above.  Plaintiff's argument that defendant should have
12  scheduled an earlier IME is also unavailing, because plaintiff
13  indicated that she would consent to an FCE so long as it was
14  conducted by a doctor.  Furthermore, there is no explanation as
15  to how plaintiff relied upon or otherwise changed her conduct in
16  response to defendant's alleged representation that it would
17  schedule an FCE.  Similarly, even if the court agreed that
18  defendant failed to resolve plaintiff's appeal in a timely
19  fashion, there is no allegation that plaintiff relied upon this
20  representation to her detriment.

21       Plaintiff's primary claim is that defendant intentionally
22  or negligently promised her benefits that she did not receive,
23  but was entitled to receive.  In other words, the representation
24  at issue is the very definition of disability employed in the
25  policy.  Whether this representation was false turns on
26  plaintiff's entitlement to benefits, which, as discussed above

32

1    with regard to the breach of contract claim, is the subject of

2    a genuine dispute.   However, defendant may still prevail on

3    summary judgment if it can demonstrate that there is no genuine

4    dispute that it did not know, and should not have known, that

5    plaintiff was entitled to benefits.

6         Defendant has failed in meeting its burden on summary

7    judgment with regard to the knowledge/scienter element.   Intent

8    may be inferred from a defendant's subsequent conduct after

9    making an alleged misrepresentation.   <u>Wetherbee v. United Ins.</u>

10   <u>Co. of America</u>, 265 Cal. App. 2d 921, 932 (1st Dist. 1968).

11   Here, defendant argues that intent may not be inferred from the

12   circumstances,[11] but fails to engage the factual record, or even

13   cite to it.   One could infer that defendant intentionally

14   terminated plaintiff's benefits, even though it knew that she

15   was entitled to the these benefits.[12]   A fortiori, a reasonable

16

17        [11] Defendant relies on an unpublished case, <u>Brewer</u>, for the
     proposition that "intent cannot be inferred merely from a
18   defendant's claim processing procedures, even if such procedures
     result in an interpretation of the policy terms that is
19   unreasonable." <u>Brewer v. Fortis Ins. Co.</u>, No. C 03–05150 SI, 2005
     WL 645414, at *6 (N.D. Cal. March 21, 2005).   However, <u>Brewer</u> says
20   nothing of the sort.   Rather, the court in <u>Brewer</u> merely held that
     the plaintiff, who sued his insurance company, failed to allege a
21   misrepresentation   whatsoever,   given   that   the   parties   never
     discussed   the   alleged   misrepresentation,   and   that   the
22   misrepresentation was not material.   Here, however, the alleged
     misrepresentation goes to the heart of plaintiff's disability
23   policy.

24        [12] Moreover, this conclusion would not contradict the court's
     ruling with respect to the bad faith claim.   For example, an
25   insurer may be liable for intentional misrepresentation because it
     had the subjective intent to defraud the insured but not liable for
26   bad faith because its actions were objectively reasonable.   <u>See</u>
     <u>Morris</u>, 109 Cal. App. 4th at 973 (holding, in the context of a bad

1    jury could also conclude that defendant was negligent in

2    terminating plaintiff's benefits because the weight of the

3    evidence indicated that she was disabled within the meaning of

4    the policy.   The issue of scienter is a question reserved for

5    the jury.

6         Accordingly, the court denies summary judgment with respect

7    to the intentional and negligent misrepresentation claims.

8    **E. Intentional Infliction of Emotional Distress**

9         Defendant also moves for summary judgment on plaintiff's

10   intentional infliction of emotional distress claim.   In

11   California, the elements of a prima facie case for the tort of

12   intentional infliction of emotional distress are (1) outrageous

13   conduct, (2) intent or recklessness, (3) severe emotional

14   distress, and (4) actual and proximate causation.   <u>Austin v.</u>

15   <u>Terhune</u>, 367 F.3d 1167, 1172 (9th Cir. 2004).   As set forth

16   below, the court grants summary judgment with respect to this

17   claim.

18        Plaintiff's claim fails because she cannot prove the first

19   element.   Conduct is outrageous if it exceeds all bounds of that

20   usually tolerated in a civilized society.   <u>Newberry v. Pacific</u>

21   <u>Racing Ass'n</u>, 854 F.2d 1142, 1150 (9th Cir. 1988); <u>see also</u>

22   <u>Schneider v. TRW, Inc.</u>, 938 F.2d 986, 992 (9th Cir. 1991)

23

24   faith claim, that "if the conduct of [the insurer] in defending
     this case was objectively reasonable, its subjective intent is
     irrelevant.").   In addition, while the genuine dispute doctrine may

25   immunize an insurer from liability for bad faith, there is no
     analogous defense in the context of intentional misrepresentation.

26

1    (holding that summary judgment is proper if a claim cannot

2    "reasonably be regarded as so extreme and outrageous as to

3    permit recovery") (internal quotations omitted).

4        Here, defendant's surveillance of plaintiff does not exceed

5    all bounds of that usually tolerated in a civilized society.  To

6    the contrary, surveillance in disability insurance cases is

7    "commonplace."  See Teague v. Home Ins. Co., 168 Cal. App. 3d

8    1148, 1153 (2d Dist. 1985).  Barring exceptional circumstances,

9    surveillance is not the kind of conduct that can be deemed

10   outrageous.  The facts here are unlike cases in which courts

11   have found that surveillance, in combination with other factors,

12   crosses the line into outrageous conduct.  See, e.g., Unruh v.

13   Truck Ins. Exchange, 7 Cal. 3d 616 (1972) (finding

14   outrageousness where investigator tricked plaintiff into

15   romantic relationship and shook rope bridge that plaintiff was

16   standing on in order to obtain pictures of her reaction).

17       Even if plaintiff had psychological problems such as

18   obsessive-compulsive behavior and paranoia, Pohls Decl. at ¶ 32,

19   Ex. 31, and defendant was on notice about these problems,

20   reasonable surveillance under such circumstances would still not

21   rise to the level of outrageous conduct.  See Teague, 168 Cal.

22   App. 3d at 1152 ("The knowledge that surveillance might

23   exacerbate a claimant's psychological or emotional problems does

24   not preclude the use of reasonable surveillance techniques by

25   compensation carriers.").

26       Accordingly, the court grants summary judgment with respect

1    to the intentional infliction of emotional distress claim.

2    **F. Negligent Infliction of Emotional Distress**

3        Defendant also moves for summary judgment with respect to

4    plaintiff's negligent infliction of emotional distress claim.

5    While defendant's conduct may not have been outrageous, that

6    does not negate the possibility that it was negligent,

7    particularly in light of plaintiff's psychological condition.

8    Because defendant has failed to establish the absence of a

9    genuine issue with respect to any of the element of the

10   negligent infliction of emotional distress claim, summary

11   judgment must be denied.

12       Under California law, a cause of action for negligent

13   infliction of emotional distress requires that a plaintiff

14   demonstrate (1) serious emotional distress, (2) actual and

15   proximate causation, (3) wrongful conduct by the defendant, and

16   (4) foreseeability. Austin, 367 F.3d at 1172. The claim is not

17   an independent tort but simply a species of negligence. Lawson

18   v. Mgmt. Activities, Inc., 69 Cal. App. 4th 652, 656 (4th Dist.

19   1999) ("[T]here is no such thing as the independent tort of

20   negligent infliction of emotional distress."). Accordingly, the

21   elements of duty, breach, causation, and damages apply to a

22   claim for negligent infliction of emotional distress. Macy's

23   California, Inc. v. Superior Court, 41 Cal. App. 4th 744, 747

24   (1st Dist. 1995).

25       Defendant's only argument against the negligence claim is

26   that plaintiff's emotional distress is not severe. Severe

36

1   emotional distress exists if the distress is "of such
2   substantial quantity or enduring quality that no reasonable
3   [person] in civilized society should be expected to endure it."
4   Fletcher v. W. Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 397
5   (4th Dist. 1970).   Plaintiff has tendered the psychological
6   evaluation of Dr. Albert Globus, who noted that defendant's
7   surveillance led to "an aggravation of her signs and symptoms of
8   anxiety, obsessive compulsive behaviors, hypervigilance, and
9   mildly paranoid interpretation of her social environment."
10  Globus Aff. at ¶¶ 12-16.   Although a close issue, reasonable
11  jurors could disagree as to whether this constitutes "severe"
12  distress, particularly given Dr. Globus' suggestion that her
13  recovery would be significantly prolonged.   In response,
14  defendant merely distinguishes cases in which the insured's
15  emotional distress was deemed severe; however, those cases do
16  not indicate the threshold at which emotional distress becomes
17  severe.

18       Because there is a genuine dispute as to whether
19  plaintiff's emotional distress is severe, summary judgment as to
20  the negligent infliction of emotional distress claim must be
21  denied.

22  **G. Punitive Damages**

23       Finally, defendant moves for summary judgment on the issue
24  of punitive damages.   Under California law, a plaintiff may
25  recover punitive damages if it is proven "by clear and
26  convincing evidence that the defendant has been guilty of

1  oppression, fraud, or malice."   Cal Civ. Code § 3294(a);

2  Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d 998,

3  1013 (9th Cir. 2004).   Plaintiff must show that defendant

4  "engaged in despicable conduct with a conscious disregard of the

5  rights or safety of others."   Kransco v. Am. Empire Surplus

6  Lines Ins. Co., 23 Cal. 4th 390, 398-99 (2000).

7      Given the court's ruling with respect to the intentional

8  misrepresentation claim, defendant's motion must be denied.

9  See, e.g., R&B Auto Center v. Farmers Group, Inc., 140 Cal. App.

10  4th 327, 347 n.9 (4th Dist. 2006) (permitting punitive damages

11  based on intentional misrepresentation claim).   However, the

12  court may not award punitive damages based on any of the other

13  claims, such as the breach of contract claim, the individual UCL

14  claim, or the negligent infliction of emotional distress claim.

15  See Cates Constr. v. Talbot Partners, 21 Cal. 4th 28, 980 P.2d

16  407, 427 (1999) (holding that punitive damages are not available

17  for breach of contract absent some independent tort).

18      Because punitive damages are available for an intentional

19  misrepresentation claim, summary judgment must be denied.

20                          **V. CONCLUSION**

21      1.   Defendant's motion for summary judgment as to the

22           representative UCL claim is GRANTED.

23      2.   Defendant's motion for summary judgment as to the

24           breach of contract claim is DENIED.

25      3.   Defendant's motion for summary judgment as to the bad

26           faith claim is GRANTED.

38

4.  Defendant's motion for summary judgment as to the intentional misrepresentation claim is DENIED.

5.  Defendant's motion for summary judgment as to the negligent misrepresentation claim is DENIED.

6.  Defendant's motion for summary judgment as to plaintiff's intentional infliction of emotional distress claim is GRANTED.

7.  Defendant's motion for summary judgment as to plaintiff's negligent infliction of emotional distress claim is DENIED.

8.  Defendant's request that the court bar recovery for punitive damages is DENIED.

IT IS SO ORDERED.

DATED: November 6, 2006.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

39